CHAMBER OF COMMERCE OF THE UNITED STATES, National Association of Manufacturers, American Trucking Associations, Inc., and Food Marketing Institute, Petitioners,

v.

UNITED STATES DEPARTMENT OF LABOR, Occupational Safety & Health Administration, and Alexis M. Herman, Secretary, United States Department of Labor, Respondents.

Food Distributors International, et al., Intervenors.

No. 98–1036.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 3, 1998.

Decided April 9, 1999.

Baruch A. Fellner argued the cause for petitioners. With him on the briefs were William J. Kilberg, Eugene Scalia, Stephen A. Bokat, Janice S. Amundson, Daniel R. Barney, Lynda S. Mounts, George Green, and Peter A. Susser.

Bruce Justh, Assistant Counsel for Appellate Litigation, U.S. Department of Labor, argued the cause for respondents. With him on the brief were Joseph M. Woodward, Associate Solicitor for Occupational Safety and Health, and Barbara Werthmann, Counsel for Appellate Litigation.

Before: SILBERMAN, GINSBURG and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

Dissenting opinion filed by Circuit Judge SILBERMAN.

GINSBURG, Circuit Judge:

The Occupational Safety and Health Administration, part of the United States Department of Labor, issued a "Directive" pursuant to which each employer in selected industries will be inspected unless it adopts a comprehensive safety and health program designed to meet standards that in some respects exceed those required by law. The Chamber of Commerce objects to the Directive on the grounds that prior notice and an opportunity to comment were required by the Administrative Procedure Act, and that the envisioned inspections will violate the Fourth Amendment to the Constitution of the United States. Because we agree with the Chamber that the agency issued the Directive in violation of the APA, we do not reach the constitutional issue.

## I. Background

According to the OSHA, the Directive, which establishes the "OSHA High Injury/Illness Rate Targeting and Cooperative Compliance Program," represents a new, cooperative approach to the problem of worker safety at some 12,500 relatively dangerous workplaces. The Directive first provides that each of these sites will be placed on a so-called "primary inspection list" and subjected to a comprehensive inspection before the end of 1999. (But for the Directive, the OSHA might have searched some of the sites, but it does not claim that it would have searched all of them). The Directive next provides that the agency will remove a workplace from the primary inspection list, and reduce by 70 to 90 percent the probability that it will be inspected, if the employer participates in the agency's "Cooperative Compliance Program."

Participation in the CCP obligates the employer to satisfy eight requirements. An employer must agree, for example, to "[i]dentify and correct hazards" and to "[w]ork toward a significant reduction of injuries and illnesses." Most important is the requirement that the employer implement a "comprehensive safety and health program" (CSHP) that meets the standard established in the OSHA's 1989 Safety and Health Program Management Guidelines.

The Directive spells out what is entailed. Most of the requirements are procedural. A CSHP, for example, should include regular, employer-conducted inspections of the workplace, investigations of "near-miss" incidents, and a means by which employees can complain of unsafe practices and circumstances without fear of reprisal. An adequate CSHP should also, however, address specific substantive problems associated with "ergonomics, materials handling, bloodborne pathogens, confined space, [and] hazard communication." Although many aspects of a CSHP are, not surprisingly, directed toward the prevention or correction of violations of the Occupational Safety and Health Act, 29 U.S.C. §§ 651–678, the Directive makes clear that compliance with the Act is not in itself sufficient for participation in the new CCP: "An effective [CSHP] looks beyond specific requirements of law to address all hazards. It will seek to prevent injuries and illness-

es, whether or not compliance is at issue." Further to this point, an acceptable CSHP also obligates the employer to be generally in compliance with applicable "voluntary standards," "industry practices," and even "suppliers' safety recommendations."

## II. Analysis

The Chamber of Commerce petitions for review of the Directive first on the ground that the agency should have conducted a notice and comment rulemaking proceeding prior to issuing it. Before considering the Chamber's argument, however, we must consider the agency's objection that the case is not within the jurisdiction of this court.

## A. Jurisdiction

 Under the OSH Act, 29 U.S.C. § 655(f), this court has jurisdiction to review a "standard" issued by the OSHA. An OSHA "regulation," however, is subject to review in the district court, pursuant to the Administrative Procedure Act, 5 U.S.C. § 703. *See Workplace Health & Safety Council v. Reich,* 56 F.3d 1465, 1467 (D.C.Cir.1995). The OSH Act does not define the term "regulation," but describes a "standard" as a rule that "requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment." 29 U.S.C. § 652(8). The question whether a rule is a "standard," so defined, is to be answered with reference to its "basic function . . . rather than the exact nature of the 'practices, means, methods, operations or processes' . . . it embodies." *Workplace Health,* 56 F.3d at 1468 (quoting *Louisiana Chemical Ass'n v. Bingham,* 657 F.2d 777, 781 (5th Cir. 1981)). If the basic function of the rule is to "address[ ] . . . a specific and already identified hazard, [and it is] not a purely administrative effort designed to uncover violations of the Act," then the rule is a

standard. *Id.* (quoting *Louisiana Chemical,* 657 F.2d at 782). If, on the other hand, the rule is "merely a general enforcement or detection procedure," then it is a regulation. *Id.* In other words, a standard, unlike a regulation, is "aim[ed] toward correction rather than mere inquiry into possible hazards." *Id.* (quoting *Louisiana Chemical,* 657 F.2d at 782).

The OSHA argues that the Directive here at issue must be considered a regulation for two reasons. First, it lacks some of the formal attributes of the typical standard. In particular, according to the agency, an employer's participation in the CCP is strictly voluntary; the Directive is not backed by the threat of a legal sanction, and it does not preempt any regulation imposed by a state. Second, we are told, the Directive cannot be a standard because it does not address a "specific and already identified hazard."

Although the proper characterization of the Directive is not without difficulty, we do not think either argument that it is a regulation rather than a standard withstands scrutiny. As to the first, it is true that the Directive does not formally require anything: An employer is not subject to a legal penalty for failing to join the CCP; it will be subject only to a safety inspection for its recalcitrance. Our concern, however, is with the practical effect (the "basic function") of the rule, not its formal characteristics. 56 F.3d at 1468. The Chamber of Commerce asserts, and the agency does not deny, that as a practical matter being subjected to a safety inspection can be quite as onerous for an employer as paying a fine imposed by the OSHA. *See Cerro Metal Prods. v. Marshall,* 620 F.2d 964, 974 (3d Cir.1980) (comprehensive OSHA "[i]nspections . . . frequently extend over several weeks. They necessarily create inconvenience to the employer and a certain amount of lost time for employees who escort the inspector or are otherwise disrupted in their work").*

---

* For this reason, we also reject the OSHA's separate argument that the Chamber does not

Indeed, one of the agency's objectives, as stated in the Directive, is to "leverage limited OSHA resources" by encouraging employers to adopt a "comprehensive safety and health program." This can only mean that the agency is intentionally using the leverage it has by virtue solely of its power to inspect. The Directive is therefore the practical equivalent of a rule that obliges an employer to comply or to suffer the consequences; the voluntary form of the rule is but a veil for the threat it obscures. For the same reason, it is of no great moment that the Directive purports not to preempt state law, although that is undoubtedly a point of difference between it and a formal OSHA standard. The distinction is not germane to our inquiry because the failure to preempt does not make the Directive, as a practical matter, any more or less a rule that "requires conditions ... necessary ... to provide safe or healthful employment."

The OSHA's second argument is that the Directive does not fit squarely within the definition of the term "standard" that we accepted from the Fifth Circuit in *Workplace Health*: Insofar, that is, as the Directive is intended to encourage the spread of safety programs that address "all hazards" in the workplace, the OSHA argues it is not a "remedial measure addressed to a specific and already identified hazard." 56 F.3d at 1468. That the Directive must therefore be deemed a regulation, however, does not follow. While the Directive fits the definition of a standard only imperfectly, it fits the definition of a regulation not at all. The Directive is clearly not, for example, "a purely administrative effort designed to uncover violations of the Act." By its terms, it aims to foster safety policies more stringent than any required by the Act or by the regulations implementing the Act, including, as we have seen, "voluntary standards," "industry practices," and "suppliers' safety

standards." *Cf. id.* ("[S]tandards should aim toward correction rather than mere inquiry into possible hazards"). Nor, in view of the Directive's stated goal of correcting, rather 'than merely uncovering, specific dangers in the workplace, including hazards not covered by any OSHA standard, can it be described as "merely an enforcement or detection procedure designed to further the goals of the Act generally."

In any event, we doubt that the "specific and already identified hazard" criterion can bear the weight the OSHA would place upon it. The phrase was not integral to the outcome reached in either *Workplace Health* or *Louisiana Chemical*. The rules held to be regulations in those cases were procedural; they did not directly address any hazard, specific or otherwise, identified or not. *See Workplace Health*, 56 F.3d at 1466 (rule requiring employers to report work-related deaths and hospitalizations); *Louisiana Chemical*, 657 F.2d at 778–79 (rule requiring employers to make available records of employees' exposure to toxic substances). In fact, *Louisiana Chemical* suggests that the specificity of the hazard a rule aims to correct is not as important as whether the basic function of the rule is substantive. That a rule is directed toward a particular danger, rather than danger in general, may be relevant to whether it qualifies as a standard; it is not, however, dispositive. *See id.* at 783 n. 9 ("Our problem with calling the Records Access rule a standard lies not so much in the number [of hazards it addresses] as with our perception of its basic function: enforcement and detection. Lack of particularity is merely one aspect of this function").

In sum, we are forced by the jurisdictional structure and form of the OSH Act to characterize the Directive either as a "standard" or as a "regulation." Although neither moniker is entirely apt, we con-

have standing to sue because, absent a legal penalty for non-participation, employers suf-

fer no cognizable injury.

clude that the Directive is a "standard" within the meaning of § 652(8) because it effectively obligates employers, under penalty of certain inspection, to adopt a CSHP, and thereby imposes upon employers new safety standards more demanding than those required by the Act or by any pre-existing regulation implementing the Act. And because the Directive is a standard, we have jurisdiction under § 655(f) to consider the Chamber's petition to review it.

## B. Notice and Comment

Under the APA, 5 U.S.C. § 553, an agency seeking to promulgate a rule must first provide the public with notice of, and an opportunity to comment upon, a proposed version of it. The OSHA concedes that the Directive is, in APA parlance, a "rule," and therefore that § 553 applies. *See United States Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1149–51 (5th Cir.1984) (agency inspection plan is a rule for purposes of § 553). The agency takes the position, however, that notice and comment rulemaking was not required because the Directive falls into the exceptions provided in § 553(b)(3)(A) for "rules of agency ... procedure" and "general statements of policy."

## 1. Procedural rule

▮ A procedural rule is one that does not itself "alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency." *Batterton v. Marshall*, 648 F.2d 694, 707 (D.C.Cir.1980). A substantive rule, in contrast, has a "substantial impact" upon private parties and "puts a stamp of [agency] approval or disapproval on a given type of behavior." *American Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1047 (D.C.Cir.1987). This distinction is often difficult to apply, as even a purely procedural rule can affect the substantive outcome of an agency proceeding. *See JEM Broad. Co. v. FCC*, 22 F.3d 320, 326 (D.C.Cir.1994). Because of

this difficulty, we apply § 553(b)(3)(A) with an eye toward balancing the need for public participation in agency decisionmaking with the agency's competing interest in "retain[ing] latitude in organizing [its] internal operations." *Batterton*, 648 F.2d at 707.

▮ In defense of its position that the Directive is a procedural rule, the OSHA advances two arguments. First, minimizing the significance of the CCP, it asserts that the Directive is merely an inspection plan that does not put its "stamp of approval or disapproval" on any particular behavior. Then, ignoring the inspection plan, it maintains that the Directive has no "substantial impact" upon covered employers because of the voluntary nature of the CCP. But the inspection plan and the CCP are two elements of the same rule; in determining whether notice and comment were required before it could be promulgated, we must view the rule as a whole.

So viewed, it is apparent that the Directive cannot be considered procedural. If the function of the CCP were simply to provide each employer with the option of substituting self-inspection for an equivalent inspection conducted by the OSHA, then the agency could make a creditable argument that the Directive does not represent the kind of normative judgment characteristic of a substantive rule. *See Guardian Fed. Savings & Loan Ass'n v. FSLIC*, 589 F.2d 658, 665 (D.C.Cir.1978) (rule requiring regulated institutions to hire private accountants to perform audits is procedural). The OSHA may not, however, tell employers in one breath that participation in the CCP requires more than mere compliance with the OSH Act—which clearly ups the substantive ante—and tell us in the next that the sole purpose of the CCP is to make unnecessary the inspections it performs in order to uncover violations of the Act. At least to the extent that participation in the CCP requires more than adherence to existing law, the Directive imposes upon employers more than "the incidental inconveniences

of complying with an enforcement scheme," *Bowen,* 834 F.2d at 1051; it has a substantive component.

This conclusion is supported also by the underlying reasons for distinguishing between substantive and procedural rules in prescribing procedures for rulemaking. The Directive is intended to, and no doubt will, affect the safety practices of thousands of employers. The value of ensuring that the OSHA is well-informed and responsive to public comments before it adopts a policy is therefore considerable. The other side of the balance, moreover, is empty: The agency does not contend that its need for "latitude in organizing [its] internal operations" is implicated at all in the present case. *Batterton,* 648 F.2d at 707.

Nor can the OSHA prevail by renewed resort to its observation that the Directive is not backed by the threat of a legal sanction. Like the jurisdictional issue discussed above, the question whether a rule is substantive or procedural for the purposes of § 553(b) is functional, not formal. That is why we examine how the rule affects not only the "rights" of aggrieved parties, but their "interests" as well. *Batterton,* 648 F.2d at 707; *see also Bowen,* 834 F.2d at 1045 ("Substantive rules are ones which grant rights, impose obligations, or produce other significant effects on private interests"). Of course, whether a rule has the force of law often will bear upon its proper classification as substantive or procedural. *See, e.g., Chrysler Corp. v. Brown,* 441 U.S. 281, 301–02, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979) (that agency rule is backed by the force of law suggests it is substantive).** It will not necessarily be controlling, however. Here, for example, the Directive will affect employers' interests in the same way that a plainly substantive rule mandating a comprehensive safety program

would affect their rights; that it so operates without having the force of law is therefore of little, if any, significance. In practical terms, the Directive places the burden of inspection upon those employers that fail to adopt a CSHP, and will have a substantial impact upon all employers within its purview—including those that acquiesce in the agency's use of "leverage" against them. Consequently, we conclude that the Directive is a substantive rather than a procedural rule.

### 2. General statement of policy

■ A general statement of policy "does not establish a binding norm. It is not finally determinative of the issues or rights to which it is addressed. The agency cannot apply or rely upon [such a] policy as law because a general statement of policy only announces what the agency seeks to establish as policy." *Pacific Gas & Elec. Co. v. FPC,* 506 F.2d 33, 38 (D.C.Cir.1974). The OSHA argues that the Directive meets this definition, raising once more the point that the rule imposes no formal legal obligation upon an employer that chooses not to participate in the CCP.

In this context, the agency's contention has some intuitive appeal: At first glance, one might think that a rule could not be considered a "binding norm" unless it is backed by a threat of legal sanction. Beyond that first glance, however, its appeal is fleeting.

In *American Bus Association v. United States,* 627 F.2d 525 (1980), we held that the question whether a rule is a policy statement is to be determined by whether it (1) has only a prospective effect, and (2) leaves agency decisionmakers free to exercise their informed discretion in individual cases. *See id.* at 529–30. Both criteria lead us here to the conclusion that the Directive is a substantive rule rather than

---

** Citing *Chrysler Corp.,* the agency argues that because a rule backed by the force of law is substantive, a rule that has no binding legal authority must therefore be procedural. By the same reasoning, one would conclude that because all men are mortal, women must be immortal.

a policy statement. First, the Directive provides that every employer that does not participate in the CCP will be searched. The effect of the rule is therefore not to "announce[ ] the agency's tentative intentions for the future," *Pacific Gas,* 506 F.2d at 38, but to inform employers of a decision already made. *See American Bus Ass'n,* 627 F.2d at 531 (order indicating that applicants providing certain documents would receive "immediate issuance" of certificate permitting transport of goods to Canada had current, not prospective, effect and therefore was not statement of policy); *cf. Pacific Gas,* 506 F.2d at 40–41 (order intended to inform public of types of plans that will receive "initial and tentative" agency approval is policy statement). Indeed, the OSHA admits in its brief that the inspection plan "leave[s] no room for discretionary choices by inspectors in the field." And the Directive itself suggests that the agency will not remove an employer from the CCP unless the employer fails to abide by the terms of the program. Therefore, although the Directive does not impose a binding norm in the sense that it gives rise to a legally enforceable duty, neither can it be shoehorned into the exception for policy statements.

### III. Conclusion

For the foregoing reasons, we hold first that the Directive is a standard within the meaning of 29 U.S.C. § 655(f) and therefore that we have jurisdiction over the Chamber's petition for review. Because the Directive is neither a procedural rule nor a policy statement, we hold that the OSHA was required by the APA to conduct a notice and comment rulemaking proceeding before issuing it. The Directive is therefore vacated without prejudice to the ability of the agency to repromulgate it after observing the required procedures.

*So Ordered.*

SILBERMAN, Circuit Judge, dissenting:

I would agree with the majority on the merits if I thought we had jurisdiction to review OSHA's Directive. But as I read *Workplace Health and Safety Council v. Reich,* 56 F.3d 1465 (D.C.Cir.1995), the Directive is not a "standard" reviewable directly in the court of appeals. That is so because, although I believe the Directive is an APA regulation—I simply do not understand the majority's explanation why it is not, *see* Maj. Op. at 210—it is not directed at a "particular hazard." Therefore, under our governing precedent, petitioners should be obliged to seek review first in the district court.