# Authority to Prescribe Regulations Limiting the Partisan Political Activities of the Commissioned Officers Corps in the National Oceanic and Atmospheric Administration

The Department of Commerce may prescribe regulations limiting the partisan political activities of the Commissioned Officers Corps in the National Oceanic and Atmospheric Administration.

July 29, 2004

MEMORANDUM OPINION FOR THE ACTING GENERAL COUNSEL
DEPARTMENT OF COMMERCE

You have asked for our opinion on whether the Department of Commerce may prescribe regulations limiting the partisan political activities of the Commissioned Officers Corps in the National Oceanic and Atmospheric Administration ("NOAA Corps").[1] We conclude that 5 U.S.C. § 301 (2000) allows the Secretary to issue such regulations.

## I.

The federal Hatch Act limits the partisan political activities of most federal employees. 5 U.S.C. §§ 7321–7327 (2000). Employees covered by the Hatch Act must refrain, in most instances, from soliciting, accepting or receiving political contributions, *id.* § 7323(a)(2), running as a candidate for election to a partisan political office, *id.* § 7323(a)(3), or soliciting or discouraging the participation in any political activity of any persons who have an application for any compensation, grant, contract, ruling, license, permit or certificate pending before the employing office of such employee, *id.* § 7323(a)(4)(A). These restrictions apply only to an "employee" of the federal government, which 5 U.S.C. § 7322(1) defines as:

> any individual, other than the President and the Vice President, employed or holding office in—(A) an Executive agency other than the General Accounting Office; (B) a position within the competitive service which is not in an Executive agency; or (C) the government of the District of Columbia, other than the Mayor or a member of the City Council or the Recorder of Deeds; *but does not include a member of the uniformed services*.

(Emphasis added.) The "uniformed services" include the Armed Forces, the Public Heath Service and the NOAA Corps. 10 U.S.C. § 101(a)(5) (2000).

---

[1] The NOAA Corps consists of approximately 285 commissioned officers who operate and manage NOAA's fleet of scientific research ships and aircraft.

The Department of Defense ("DOD") has issued regulations that restrict partisan political activities by officers of the Armed Forces on active duty. *See* Department of Defense Directive 1344.10 (June 15, 1990).[2] These restrictions are similar to those found in the federal Hatch Act. *See id.* ¶¶ 4.1.2, 4.2. The Department of Health and Human Services has likewise regulated the partisan political activities of those employed by the U.S. Public Health Service. 45 C.F.R. § 73.735-601(a) (2004) ("All employees in the Executive Branch of the Federal Government . . . are subject to basic political activity restrictions in subchapter III of Chapter 73 of title 5, United States Code (the former Hatch Act) and Civil Service Rule IV.").[3] We understand that the Secretary of Commerce wishes to promulgate similar regulations for members of the NOAA Corps, and believes that 5 U.S.C. § 301 provides sufficient statutory authority for the proposed action. For the reasons that follow, we agree that 5 U.S.C. § 301 allows the Secretary of Commerce to issue the proposed regulations.

## II.

Section 301 provides, in pertinent part:

> The head of an Executive department or military department may prescribe *regulations for* the government of his department, *the conduct of its employees*, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property.

5 U.S.C. § 301 (emphasis added). The plain language of section 301 indicates that the proposed restrictions on the NOAA Corps officers' political activities are within the Secretary's authority so long as they are "regulations for . . . the conduct of [Department of Commerce] employees."

Section 301, at the very least, allows the head of a department to establish regulations for the conduct undertaken by his employees in their capacity as federal employees; no other reading of the statute could be consonant with its text. *Cf. Davis Enters. v. EPA*, 877 F.2d 1181, 1188 (3d Cir. 1989) (noting that the appellants did not even attempt to challenge EPA's authority under 5 U.S.C. § 301 to issue regulations "governing use of its employees' time"). Such authority is

---

[2] DOD's statutory authority for these regulations is 10 U.S.C. § 973 (2000), which restricts the partisan political activities of officers of the Armed Forces on active duty and authorizes the Secretary of Defense (and the Secretary of Homeland Security with respect to the Coast Guard) to prescribe implementing regulations.

[3] The Department of Health and Human Services' statutory authority for these regulations is 42 U.S.C. § 216(a) (2000), which provides that "[t]he President shall from time to time prescribe regulations with respect to the appointment, promotion, retirement, termination of commission, titles, pay, uniforms, allowances (including increased allowances for foreign service), and discipline of the commissioned corps of the Service."

sufficient to enable some, but not all, of the proposed Hatch Act-like restrictions on NOAA Corps officers. For example, regulations prohibiting partisan political activity while on the job, or prohibiting threats to demote subordinates unless they vote a certain way, would easily qualify as "regulations for . . . the conduct of [Department of Commerce] employees" under section 301.

More difficult statutory questions arise with Hatch Act-like restrictions that seek to regulate the *off-the-job* behavior of NOAA Corps officers. These officers remain "employees" of the Department of Commerce even when off duty or otherwise away from the office and, for that reason, one might conclude that restrictions on the partisan political activities of such persons are still aimed at regulating "the conduct of . . . employees" for purposes of section 301, no matter when and where the conduct occurs. This view, however, gives a very broad scope to section 301's grant of authority, and would allow a department head to regulate any "conduct" in which his employees engage, inside or outside of work, including conduct that has no nexus whatsoever to government employment.

It is not necessary to adopt such a broad construction of section 301 to find statutory authorization for the proposed regulations. We conclude that section 301 authorizes, at a minimum, the regulation of employees' on-the-job conduct, as well as off-the-job conduct that may undermine the efficient operation of the Department or the effectiveness of employees in the performance of their duties. This construction generally accords with the views adopted by the Executive Branch and the federal courts in interpreting section 301. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 283, 309 (1979) (describing section 301 as a "housekeeping statute" and "simply a grant of authority to the agency to regulate its own affairs").

Interpreting the phrase "conduct of [an] employee" categorically to exclude off-the-job conduct is not tenable. The need for a department head to manage effectively the department's internal affairs requires that he or she be able to regulate the off-the-job conduct of employees that would undercut the sound management of the department or the ability of other employees to perform their jobs effectively. *See, e.g.*, *United States v. Johnson*, 735 F.2d 373, 375 (9th Cir. 1984) (holding that 5 U.S.C. § 301 allows the Secretary of State "to impose restrictions on employees of his own department," which includes restricting employees' use of diplomatic passports outside of work). Furthermore, 5 U.S.C. § 7301 (2000) provides that "[t]he President may prescribe regulations for *the conduct of employees* in the executive branch." (Emphasis added). The President has refused to construe "the conduct of employees" in section 7301 as limited to on-the-job conduct. To the contrary, Executive Order 12674, entitled "Principles of Ethical Conduct for Government Officers and Employees," reaches a substantial amount of off-the-job conduct by executive branch employees. *See, e.g.*, Exec. Order No. 12674, § 101(j), 3 C.F.R. § 215 (1989) ("Employees shall not engage in outside employment or activities, including seeking or negotiating for employment, that conflict with official Government duties and responsibilities."); *id.* § 101(*l*) ("Employees shall satisfy in good faith their obligations as citizens, including all just

financial obligations, especially those—such as Federal, State, or local taxes—that are imposed by law."); *id.* § 102 ("No employee who is appointed by the President to a full-time noncareer position in the executive branch, including all full-time employees in the White House Office and the Office of Policy Development, shall receive any earned income for any outside employment or activity performed during that Presidential appointment.").

Like the cited provisions of Executive Order 12674, the proposed Hatch Act-like restrictions on partisan political behavior would be designed to reach off-the-job conduct in order to assist the Secretary in effectively managing the Department's operations. Both Congress and the Supreme Court have repeatedly recognized that effective public service can depend on the need for government employees to refrain from partisan political activity, inside or outside of the workplace. *See Oklahoma v. Civil Serv. Comm'n*, 330 U.S. 127, 143 (1947) ("The end sought by Congress through the Hatch Act is better public service by requiring those who administer funds for national needs to abstain from active political partisanship."); *United Pub. Workers of Am. v. Mitchell*, 330 U.S. 75, 95 (1947) ("The influence of political activity by government employees, if evil in its effects on the service, the employees or people dealing with them, is hardly less so because that activity takes place after hours."). To limit section 301's scope of authority to the regulation of on-the-job employee conduct could disable a department head from effectively managing his or her employees.

## III.

We recognize that the Supreme Court has stated that section 301 authorizes "what the APA [Administrative Procedure Act] terms 'rules of agency organization procedure or practice' as opposed to 'substantive rules.'" *Chrysler*, 441 U.S. at 310 (footnote omitted). *Chrysler* did not go so far as to hold that "rules of agency organization procedure or practice" are the *only* regulations that may be promulgated pursuant to section 301; it merely noted that such rules are one type of regulation authorized by section 301. *Id. But see* Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules With the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467, 539 (2002) ("The [*Chrysler*] Court . . . analyz[ed] the language and history of § 301, concluding that it authorized *only* 'rules of agency organization, procedure or practice,' as opposed to legislative rules.") (emphasis added). Nevertheless, several of the courts of appeals have relied on *Chrysler* to hold that section 301 may not be used as statutory authority for anything that would be deemed a "substantive rule" under the APA. *United States v. McDonnell Douglas Corp.*, 132 F.3d 1252, 1255 (8th Cir. 1998) ("[T]he Supreme Court examined the Housekeeping Statute and held that it *does not* provide statutory authority for substantive regulations."); *Schism v. United States*, 316 F.3d 1259,

1280 (Fed. Cir. 2002) (citation omitted) ("The Supreme Court . . . said § 301 . . . authorized no substantive rulemaking.").[4] To avoid a court challenge to the proposed regulations, the Department should take care that any rules issued pursuant to section 301 not be the type of regulations that could be characterized as "substantive rules" under the APA.

The APA does not define the term "substantive rule,"[5] and the courts have recognized that the distinction between "substantive rules" and nonsubstantive rules (such as interpretative rules, general statements of policy and rules of agency organization procedure or practice) is difficult to draw. *See Chamber of Commerce of U.S. v. Dep't of Labor*, 174 F.3d 206, 211 (D.C. Cir. 1999) ("This distinction is often difficult to apply, as even a purely procedural rule can affect the substantive outcome of an agency proceeding."); *Air Transp. Ass'n of Am. v. Dep't of Transportation*, 900 F.2d 369, 381 (D.C. Cir. 1990) (Silberman, J., dissenting) ("Lines between substance and procedure in various areas of the law are difficult to draw and therefore often perplex scholars and judges."). The courts have stressed, however, that "substantive rules" are those with a direct effect on the rights and obligations of *private* parties governed by the agency. *See, e.g.*, *Chamber of Commerce*, 174 F.3d at 211 ("A substantive rule . . . has a 'substantial impact' upon *private parties* and 'puts a stamp of [agency] approval or disapproval on a given type of behavior.'") (emphasis added; citations omitted); *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1045 (D.C. Cir. 1987) ("Substantive rules are ones which 'grant rights, impose obligations, or produce other significant effects on *private interests*.'") (emphasis added; citations omitted); *Air Transp. Ass'n*, 900 F.2d at 378 ("In using the terms 'rules of agency organization, procedure, or practice,' Congress intended to distinguish not between rules affecting different *classes of rights*—'substantive' and 'procedural'—but rather to distinguish between rules affecting different *subject matters*—'the rights or interests of regulated' parties, and agencies' 'internal operations.'") (internal citations omitted).

---

[4] Our Office has likewise opined that an agency may not "issue substantive regulations solely on the authority of 5 U.S.C. § 301," absent congressional ratification or approval in another statute. *See* Memorandum for the Files from Douglas W. Kmiec, Assistant Attorney General, Office of Legal Counsel, *Re: Proposed Executive Order Entitled "Safeguards Pertaining to Biomedical Research on Children"* (Jan. 23, 1989).

[5] Although the APA does not define the term, three separate provisions of the APA set forth procedures to be followed in the enactment of "substantive rules." *See* 5 U.S.C. § 552(a)(1) (2000) ("Each agency shall separately state and currently publish in the Federal Register for the guidance of the public— . . . (D) *substantive rules* of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency.") (emphasis added); 5 U.S.C. § 553(d) (2000) ("The required publication or service of a *substantive rule* shall be made not less than 30 days before its effective date, except—(1) a *substantive rule* which grants or recognizes an exemption or relieves a restriction . . .") (emphasis added); 5 U.S.C. § 558(b) (2000) ("A sanction may not be imposed or a *substantive rule* or order issued except within jurisdiction delegated to the agency and as authorized by law.") (emphasis added).

The proposed Hatch Act-like regulations, by contrast, would govern only the conduct of government employees, and would not directly affect the rights and obligations of private parties pursuant to the regulatory jurisdiction of the Department. The importance of this distinction between the regulation of government employees' conduct and the regulation of the citizenry at large has long been recognized by the Supreme Court—even when the former regulations affect public employees' off-the-job activities.[6] Similarly, the federal courts have recognized, in cases upholding public employers' anti-nepotism policies, that such restrictions on the off-duty conduct of government employees do not constitute a "substantial" or a "significant" impact on private behavior, as co-workers who wish to marry may still do so if one of them finds a new job.[7] In like manner, the proposed Hatch Act-like regulations would not produce "substantial" or "significant" effects on private parties or private interests—they would simply prevent agency employees from engaging in off-duty political activities which would undermine the efficiency and discipline of the agency's mission. For these reasons we conclude that the proposed rules would not be "substantive rules" under the APA.

## IV.

The only remaining question is whether the proposed regulations are consonant with the First Amendment. The Supreme Court has upheld as constitutional the restrictions imposed by the federal Hatch Act. *United Pub. Workers of Am. v. Mitchell*, 330 U.S. 75 (1947). Assuming that the proposed regulations do not impose restrictions beyond those found in the federal Hatch Act, there should be no constitutional problem. The only possible distinction between this situation and *United Public Workers* is that the Secretary of Commerce, rather than Congress,

---

[6] *See, e.g.*, *Kelley v. Johnson*, 425 U.S. 238, 244–45 (1976) (noting that county's hair-grooming regulation for male members of its police force was not a regulation of "the citizenry at large," but instead a regulation of the "employee[s] of the police department of Suffolk County" and finding this distinction "highly significant"); *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205*, 391 U.S. 563, 568 (1968) ("[T]he state has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general."); *see also Shawgo v. Spradlin*, 701 F.2d 470, 483 (5th Cir. 1983) (upholding discharge of police officers for off-duty dating and cohabitation, and noting that "the State has 'more interest in regulating the activities of its employees than the activities of the population at large'") (citation omitted).

[7] *See, e.g.*, *Parks v. City of Warner Robins*, 43 F.3d 609, 614 (11th Cir. 1995) ("We conclude that the [city's] anti-nepotism policy *does not directly and substantially* interfere with the right to marry. The policy does not create a direct legal obstacle that would prevent absolutely a class of people from marrying.") (emphasis added); *Waters v. Gaston Cnty.*, 57 F.3d 422, 426 (4th Cir. 1995) (holding that county's anti-nepotism policy does not "directly and substantially" interfere with the right to marry because "the Policy does not forbid marriage altogether"); *Cutts v. Fowler*, 692 F.2d 138, 141 (D.C. Cir. 1982) (holding that FCC's anti-nepotism policy did not "significantly interfere with decisions to enter into the marital relationship" because "[t]he anti-nepotism policy . . . did not prohibit the Cutts's marriage; it only prevented the employment of Mrs. Cutts in a situation in which she would necessarily have been subject to the supervision of her husband").

would be imposing the restrictions on public employees' political activities. But we can find nothing in the Supreme Court's jurisprudence to suggest that congressional ratification is a necessary condition to the constitutionality of the types of restrictions imposed by the Hatch Act. *See United Pub. Workers*, 330 U.S. at 103 ("Congress *and the administrative agencies* have authority over the discipline and efficiency of the public service.") (emphasis added); *Broadrick v. Oklahoma*, 413 U.S. 601 (1973) (upholding "mini Hatch Acts" enacted by state legislatures).

STEVEN G. BRADBURY
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*
