# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 9, 2004          Decided June 14, 2005

No. 03-1280

EDISON ELECTRIC INSTITUTE,
PETITIONER

v.

OCCUPATIONAL SAFETY & HEALTH ADMINISTRATION AND
SECRETARY OF LABOR,
RESPONDENTS

———

On Petition for Review of an Order of the
Occupational Safety and Health Administration

———

*Stephen C. Yohay* argued the cause for petitioner. With him on the briefs were *Edward H. Comer* and *J. Bruce Brown*. *James F. Laboe* entered an appearance.

*Lee Grabel*, Attorney, U.S. Department of Labor, argued the cause for respondent Secretary of Labor. With him on the brief were *Joseph M. Woodward*, Associate Solicitor, and *Ann S. Rosenthal*, Counsel.

Before: EDWARDS, HENDERSON, and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: Edison Electric Institute (EEI) petitions for review of a compliance directive issued by the Occupational Safety and Health Administration in 2003. We conclude that because the directive did not promulgate a new occupational safety or health standard under the Occupational Safety and Health Act, but rather merely reiterated a preexisting standard, this court lacks jurisdiction over EEI's petition for review.

I

The Occupational Safety and Health Act of 1970 (OSH Act) authorizes the Secretary of Labor, through the Occupational Safety and Health Administration (OSHA), to ensure safe and healthful working conditions by creating and enforcing mandatory occupational safety and health standards. 29 U.S.C. §§ 651(b)(9), 655(b). In 1989, OSHA promulgated a general industry standard for Control of Hazardous Energy, 29 C.F.R. § 1910.147. *See UAW v. OSHA*, 37 F.3d 665 (D.C. Cir. 1994). OSHA exempted electric utilities from the general standard, promising "to propose in the near future" a standard "to meet the special safety needs of that industry." 53 Fed. Reg. 15,496, 15,504 (Apr. 29, 1988). Fulfilling that promise in 1994, OSHA promulgated the Electric Power Generation, Transmission, and Distribution Standard, 29 C.F.R. § 1910.269 (Power Generation Standard or 1994 Standard), specifically to protect maintenance workers in electric power generation plants from being injured or killed by the accidental activation of equipment while they are servicing it.

The Power Generation Standard requires electric power plants to establish hazardous energy control protocols known as "lockout/tagout procedures." Under these procedures, a worker must shut down the equipment and place a lock or tag on the "energy isolating device" or control switch before commencing

repairs. 29 C.F.R. § 1910.269(d)(6)(iv). A lock is a mechanical device that keeps the equipment from being energized until the lock is removed. A tag is a warning placed to caution others not to operate the device. After the maintenance is completed, the worker removes the lock or tag and reenergizes the equipment. *Id.* § 1910.269(d)(7)(iv).

This case primarily concerns two further elements of the 1994 Power Generation Standard: the "group servicing" provision, 29 C.F.R. § 1910.269(d)(8)(ii), and the "system operator" exception, *id.* § 1910.269(d)(8)(v). The group servicing provision applies when "servicing or maintenance is performed by a . . . group" of workers. *Id.* § 1910.269(d)(8)(ii). It requires each employee in the group to "affix a personal lockout or tagout device" to a "group lockout device" or comparable mechanism "when he or she begins work," and to "remove those devices when he or she stops working." *Id.* § 1910.269(d)(8)(ii)(D). The system operator exception -- an exception to the general requirements of the Power Generation Standard -- provides that when "energy isolating devices are installed in a central location and are under the exclusive control of a system operator," the "system operator [may] place and remove lockout and tagout devices in place of" the employee doing the repair work. *Id.* § 1910.269(d)(8)(v).

EEI is a national association of shareholder-owned electric utility companies. Many of EEI's members generate, transmit, and distribute electricity, and are therefore subject to the Power Generation Standard. Soon after OSHA promulgated that standard in 1994, EEI filed a petition for review in the Eleventh Circuit. EEI was particularly concerned that the standard limits the system operator exception "to situations where 'energy isolat[ing] devices are installed in a central location and are under the exclusive control of a system operator.'" Pet'r Br. at 11 (quoting 29 C.F.R. § 1910.269(d)(8)(v)). EEI eventually

withdrew its petition for review, however, *see Edison Elec. Inst. v. OSHA*, No. 94-2389 (11th Cir. Apr. 18, 1995) (dismissing petition for review), and entered into negotiations with OSHA over the terms of a forthcoming OSHA compliance directive concerning the Power Generation Standard, Pet'r Br. at 12.

In 1997, OSHA issued that directive, OSHA Directive CPL 2-1.18A (Oct. 20, 1997) (1997 Directive). In its discussion of the group servicing provision, the 1997 Directive refers to an earlier OSHA directive that offers examples of group lockout/tagout procedures that would comply with the general industry energy control standard. According to the 1997 Directive, those sample procedures "can be used to comply with" the group servicing provision of the Power Generation Standard as well. 1997 Directive at 32. The earlier directive provides "several alternatives for having . . . employees affix personal lockout/tagout devices in a group . . . setting," including procedures involving master lockboxes and master tags. OSHA Directive STD 1-7.3, at C-2 to C-3 (Sept. 11, 1990). The 1997 Directive states that those sample procedures "are intended as examples only," and that "[o]ther means of meeting the" 1994 Standard "may also be used." 1997 Directive at 32 n.5.

On several occasions after the publication of the 1997 Directive, EEI and its members urged OSHA to interpret the Power Generation Standard to permit supervisors, rather than individual maintenance workers, to control locks and tags during group servicing. In a June 1999 letter to OSHA, EEI stated its understanding that individual worker control of locks and tags is not required by the standard's group servicing provision, and that supervisor control is adequate as long as the supervisor "accounts for" each crew member and notifies each member before reenergizing the equipment. Letter from Charles Kelly, EEI, to Richard Fairfax, OSHA (June 2, 1999). OSHA

responded in an October 1999 letter that EEI's understanding was wrong, and that "each employee in the group needs to be able to affix his/her personal . . . device as part of the group lockout." Letter from Fairfax to Kelly at 2 (Oct. 14, 1999) (quoting 59 Fed. Reg. 4320, 4361 (Jan. 31, 1994)). "[V]erbal accountability steps," OSHA said, "are *not* equivalent to each employee placing a personal device on a group [lockout/tagout] mechanism." *Id.* EEI filed a petition for review of that letter in this court, asserting that the letter amended the standard in the same way that it asserts the 2003 directive at issue in this case does. Once again, however, EEI withdrew its petition. *See Edison Elec. Inst. v. DOL*, No. 99-1518 (D.C. Cir. Feb. 28, 2000) (dismissing petition for review).

In 2000, OSHA issued a citation to Exelon Generating Corp., an EEI member, for violating the Power Generation Standard by permitting a supervisor to verbally notify individual crew members of the application and removal of lockout/tagout devices from a master tag, rather than requiring each employee to affix and remove a personal lock or tag from the master tag. Exelon defended on the ground that its method complied with the 1994 Standard, as the 1999 EEI letter had asserted. An Administrative Law Judge (ALJ) rejected that argument. *Exelon Generating Corp.*, OSHRC Docket No. 00-1198, 2001 O.S.H.D. (CCH) ¶ 32,495 (Nov. 13, 2001). At the time of EEI's petition to this court, Exelon's petition for review was pending before the Occupational Safety and Health Review Commission (OSHRC).[1]

_____

[1]On April 26, 2005, OSHRC affirmed the ALJ's finding of violation. OSHRC held that the 1994 Standard "mandates use of a personal tagout device in a group tagging situation," *Exelon Generating Corp.*, 2005 OSHRC No. 17, slip op. at 5, and that neither post-promulgation negotiations nor the 1997 Directive evidences any agreement "to substitute verbal notification of the application and

Despite OSHA's continued refusal to adopt EEI's interpretation of the Power Generation Standard, EEI persisted. In February 2000, EEI wrote OSHA two more letters, again arguing that supervisor control of locks and tags during group servicing complies with the Power Generation Standard. In addition, EEI contended that the system operator exception applies regardless of whether the system operator has exclusive physical control over the energy isolating device, so long as the system operator is the only person authorized to use the device. Letter from Kelly to Charles N. Jeffress, OSHA (Feb. 24, 2000); Letter from Kelly to Fairfax (Feb. 17, 2000). OSHA's November 21, 2000 reply again disagreed with both points. In response to the latter contention, OSHA noted that the exception permitting a system operator "to place and remove lockout and tagout devices" applies "only when the energy isolating devices are in a central location under the exclusive control of the system operator," and that "central location" means "a location to which access is physically limited to one or more persons acting as a system operator during the servicing operation." Letter from Jeffress to Kelly at 4 (Nov. 21, 2000).

On June 18, 2003, OSHA issued the compliance directive at issue in this case. The directive expressly rejects EEI's views of the 1994 Power Generation Standard's group servicing provision. It states:

> Group lockout/tagout procedures . . . must assure . . . that each individual is the only person who can release his or her personal lockout device, personal tagout device, or equivalent means of controlling hazardous energy sources. Procedures that rely solely on visual

removal of [lockout/tagout] protection for the requirement of individual worker sign on/off," *id.* at 6.

> or audible means of accounting for employees are not acceptable.

OSHA Directive CPL 2-1.38, at B-4 (June 18, 2003) (2003 Directive). The directive also rejects EEI's understanding of the system operator exception, expressly defining the term "central control location under the exclusive control of a system operator" as:

> An area to which access by employees, other than the system operator, to energy isolating devices is physically limited to a person(s) acting as a "system operator" during the maintenance or servicing operation. The system operator has complete control over the hazardous energy sources because no other employees have access to the area and its energy control devices.

*Id.* at A-2. Finally, the directive defines the term "personal tagout devices" as:

> Prominent warning devices, secured to energy isolating devices in accordance with an established procedure that uniquely identify each employee performing the servicing/maintenance activity and that indicate that the energy isolating device(s), and the machines or equipment being controlled, cannot be operated until the personal tagout device is removed.

*Id.* at A-8.

On September 12, 2003, EEI filed a petition for review in this court. EEI challenges the 2003 Directive on the following grounds, among others: that OSHA issued it without following the notice-and-comment requirements applicable to occupational

safety standards under the OSH Act, *see* 29 U.S.C. § 655(b); that the directive is unsupported by substantial evidence in the record, *see id.* § 655(f); and that the directive is arbitrary and capricious, *see* 5 U.S.C. § 706. Before we may consider the merits of EEI's challenges, however, we must first determine whether we have jurisdiction to entertain its petition for review.

## II

The OSH Act provides that any person adversely affected by an "occupational safety or health standard," 29 U.S.C. § 655(b), may, "at any time prior to the sixtieth day after such standard is promulgated," file a petition challenging the validity of the standard in an appropriate court of appeals, *id.* § 655(f). The OSH Act defines an "occupational safety and health standard" as "a standard which requires conditions, or the adoption or use of one or more practices . . . reasonably necessary or appropriate to provide safe . . . places of employment." *Id.* § 652(8). If an OSHA rule[2] does not amount to an "occupational safety or health standard," this court does not have jurisdiction to review it. *See Chamber of Commerce v. United States Dep't of Labor*, 174 F.3d 206, 209-11 (D.C. Cir. 1999) (distinguishing between a "standard" and a "regulation" for purposes of jurisdiction under the OSH Act); *Workplace Health & Safety Council v. Reich*, 56 F.3d 1465, 1467-68 (D.C. Cir. 1995) (same). Challenges to rules that are not occupational

---

[2]Section 655(b) provides that OSHA may promulgate, modify, or revoke an occupational safety or health standard "by rule." 29 U.S.C. § 655(b). In addition, the OSH Act gives the Secretaries of Labor and Health and Human Services the authority to promulgate "such rules and regulations as [they] may deem necessary to carry out their responsibilities" under the Act. *Id.* § 657(g)(2).

safety and health standards must be filed in federal district court pursuant to the Administrative Procedure Act, 5 U.S.C. § 703; *see Reich*, 56 F.3d at 1467, although other considerations may preclude immediate review in that court as well, *see Sturm, Ruger & Co. v. Chao*, 300 F.3d 867, 872-73 & n.5 (D.C. Cir. 2002).

In addition, we have indicated that we lack jurisdiction to review an OSHA rule unless it is a "new" standard. *Chamber of Commerce*, 174 F.3d at 211. The jurisdictional requirement that the standard be new -- and not simply the reiteration of an existing standard -- is supported by a number of rationales. Textually, it would be a stretch to say that a rule that merely restates an existing standard "*requires* conditions, or the adoption or use of one or more practices," as the definition of standard provides. 29 U.S.C. § 652(8) (emphasis added). In such a circumstance, it is the existing standard, not the reiteration, that compels employer practices. And it would be an even greater textual stretch to say that an OSHA rule that merely restates an earlier standard "promulgate[s]" that standard, as required by the jurisdictional language of § 655(f). *Cf. Independent Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 426 (D.C. Cir. 2004) (holding that, "because the . . . EPA Letter does not reflect any change in EPA's . . . regulations or its interpretation of those regulations, it is difficult to see how that letter 'promulgat[ed] or revis[ed] . . . any regulation'" (alterations in original)). Again, the better reading is that a standard is "promulgated" only when it is originally issued.

Moreover, to permit review whenever OSHA reiterates the requirements of a standard -- which is what OSHA contends it did in the 2003 Directive (as well as in the 1997 Directive and in the 1999-2000 correspondence with EEI) -- would circumvent § 655(f)'s requirement that any petition for review be filed "prior to the sixtieth day after such standard is promulgated." If

the 2003 Directive is no different from the 1994 Power Generation Standard, then EEI should have petitioned for review in 1994. Indeed, EEI did file a petition for review that year, but voluntarily withdrew it. If OSHA is correct that it has not changed its position since it promulgated the Power Generation Standard, then to permit review now would allow EEI to avoid the consequences of its failure to adhere to the congressionally prescribed jurisdictional window of § 655(f). *See Independent Equip. Dealers*, 372 F.3d at 428 ("Just as it would be folly to allow parties to challenge a regulation anew each year upon the annual re-publication of the Code of Federal Regulations, so too it is silly to permit parties to challenge an established regulatory interpretation each time it is repeated."); *see also General Motors Corp. v. EPA*, 363 F.3d 442, 451 (D.C. Cir. 2004) (holding that a challenge to agency letters reiterating the agency's consistently held position was untimely); *Molycorp, Inc. v. EPA*, 197 F.3d 543, 546-47 (D.C. Cir. 1999) (same).

The parties do not dispute that our jurisdiction depends upon whether the 2003 Directive establishes new obligations beyond those imposed by the 1994 Power Generation Standard. *See* 11/9/04 Oral Arg. Tape at 1:55-2:01. As might be expected, however, each has a different view as to the directive's novelty. OSHA contends that the directive "does not impose any new or independent obligations," Resp. Br. at 16, and that it is "a mere restatement of OSHA's decade-old position on the energy control provisions of the power generation standard," *id.* at 23. EEI, by contrast, insists that the directive "states new and revised mandatory and enforceable requirements," Pet'r Br. at 1, and thereby "substantively amends" the 1994 Standard, *id.* at 5.

In the following Part we consider whether the directive is (as OSHA contends) merely old wine in a new bottle, or (as EEI insists) a new vintage altogether.

### III

The heart of EEI's argument is that the 2003 Directive alters the 1994 Power Generation Standard's group servicing provision by requiring each employee to take a physical step, such as personally affixing and removing a lock, or signing on to and off of a tag -- rather than permitting the group's supervisor to accomplish lockout/tagout for the entire group following, for example, oral communication with the employees. There is no question that the directive does require personal control of locks and tags. The directive mandates that: "Group lockout/tagout procedures . . . must . . . ensur[e] that each individual is uniquely accounted for and that each individual is the only person who can release his or her personal lockout device [or] personal tagout device." 2003 Directive at B-4. And it further states that "[p]rocedures that rely solely on visual or audible means of accounting for employees are not acceptable." *Id.* Accordingly, the question is whether these statements deviate from the original standard, or merely reiterate it (albeit in somewhat clearer language). We consider EEI's five arguments in favor of the former proposition in turn.

EEI's first contention is that the 2003 Directive constitutes a change from the Power Generation Standard because neither the text of the 1994 Standard, nor that of the preamble accompanying it, requires that maintenance employees working in a group "exercise personal accountability by affixing personal locks or tags or their equivalent to energy control devices." Pet'r Br. at 33. But this contention is simply incorrect. The 1994 Standard expressly states that, "[w]hen servicing or maintenance is performed by" a group, "[e]ach authorized employee shall affix a *personal* lockout or tagout device . . . , or comparable mechanism, when he or she begins work and shall remove those devices when he or she stops working." 29 C.F.R. § 1910.269(d)(8)(ii)(D) (emphasis added). That

provision reflects OSHA's view, as stated in the 1994 preamble, that "the only way to ensure that the employee is aware of whether or not the lockout or tagout device is in place is to permit only that employee to remove the device himself or herself." 59 Fed. Reg. at 4360; *see id.* at 4361 ("[E]ach employee in the group needs to be able to affix his/her personal lockout or tagout system device as part of the group lockout." (quoting 54 Fed. Reg. 36,644, 36,681-82 (Sept. 1, 1989))). Indeed, in announcing the 1994 Standard, OSHA expressly rejected "EEI['s] argu[ment] that the person removing a lockout or tagout device need not be the same as the person who placed it," and instead adopted the position that "each employee must have the assurance that the device is in his or her control, and that it will not be removed by anyone else except in an emergency situation." *Id.* at 4360; *see also id.* at 4361 ("The authorized employee in charge of the group lockout or tagout cannot reenergize the equipment until each employee in the group has removed his/her personal device." (quoting 54 Fed. Reg. at 36,681-82)).[3]

EEI's second argument is that the 2003 Directive changes the Power Generation Standard by adding, for the first time, a definition of the term "central location under the exclusive control of a system operator" that assertedly alters the term's original meaning. The term plays a key role in the system operator exception to the general requirements of the Power Generation Standard. Under the 1994 Standard, the exception

---

[3]As EEI points out, the 1994 preamble also states that "the procedure must ensure that no lock or tag is removed without the *permission* of the authorized employee." 59 Fed. Reg. at 4364 (emphasis added). But whatever the word "permission" may otherwise connote, in the context of the other statements quoted above it plainly requires personal handling of a lock or tag and not mere oral assent.

applies only when "energy isolating devices are installed in a central location and are under the exclusive control of a system operator." 29 C.F.R. § 1910.269(d)(8)(v). In such circumstances, the "system operator" may "place and remove lockout and tagout devices in place of" the individual maintenance employee. *Id.* § 1910.269(d)(8)(v)(B).

The 2003 Directive defines this key term as an "area to which access by employees, other than the system operator, to energy isolating devices is physically limited." 2003 Directive at A-2. It further explains that the system operator exception applies only when the "system operator has complete control over the hazardous energy sources because no other employees have access to the area and its energy control devices." *Id.* According to EEI, this definition marks a dramatic change from the Power Generation Standard, because it limits the system operator exception to cases in which the operator is the only employee with *physical access* to the equipment. By contrast, in EEI's view the 1994 Standard permits a supervisor to place and remove locks and tags for other employees whenever the supervisor has exclusive *administrative control* over the machinery under repair -- i.e., whenever the system operator is the only person authorized to operate the equipment.

But what EEI calls a "new definition," Pet'r Br. at 21, is in fact a near-verbatim recitation of the text of the 1994 preamble. *Compare* 2003 Directive at A-2 ("The system operator has *complete control over the hazardous energy sources* because no other employees have *access to the area and its energy control devices*." (emphasis added)), *with* 59 Fed. Reg. at 4364 ("Under [the system operator exception], the system operator has *complete control over hazardous energy sources . . . .* Other employees do not even have *access to the energy control devices* and cannot operate them." (emphasis added)). And the preamble's insistence that the system operator have "complete

control" because "[o]ther employees do not even have access to the energy control devices," *id.* at 4364, strongly supports the directive's focus on physical control.

The 2003 Directive's definition of "central location" is also consistent with the definition in the letter that OSHA sent EEI on November 21, 2000. In response to EEI's contention that the system operator exception applies regardless of whether the system operator has exclusive physical control of the energy isolating device, OSHA there explained that "central location" means "a location to which access is physically limited to one or more persons acting as a system operator during the servicing operation." Letter from Jeffress to Kelly at 4 (Nov. 21, 2000).

EEI's third argument is that dramatic change is wrought by yet another definition in the 2003 Directive: that of "personal tagout devices." The directive defines such devices as "[p]rominent warning devices" that "uniquely identify each employee performing the servicing/maintenance activity and that indicate that" the equipment under repair "cannot be operated until the personal tagout device is removed." 2003 Directive at A-8. Although EEI does not explain what it thinks the term meant in the original standard, the directive's definition is perfectly consistent with that standard. The requirement that personal tagout devices "uniquely identify each" maintenance employee can be found in the 1994 Standard at § 1910.269(d)(3)(ii)(E), which states that "[e]ach lockout device or tagout device shall include provisions for the identification of the employee applying the device." And the requirement that the equipment under repair "cannot be operated until the personal tagout device is removed" simply restates the command of § 1910.269(d)(7)(iv), that "[e]ach lockout or tagout device shall be removed from each energy isolating device by the authorized employee who applied the lockout or tagout device" before "energy is restored to the" equipment.

Fourth, EEI contends that the 2003 Directive is a new standard because it is inconsistent with OSHA's 1997 Directive regarding the Power Generation Standard. EEI directs our attention to Appendix B of the 1997 Directive, which in turn refers to Appendix C of the earlier directive regarding the general industry lockout/tagout standard. Appendix B states: "Appendix C [of the earlier directive] presents example group lockout/tagout procedures that can be used to comply with" the 1994 Power Generation Standard. 1997 Directive at 32.

At first glance, the 1997 Directive's reference to Appendix C seems to offer little succor to EEI, since the text of Appendix C is completely consistent with the 2003 Directive. It states:

> Normal group lockout/tagout procedures require *the affixing of individual lockout/tagout devices* by each authorized employee to a group lockout device . . . . The use of the work permit or "master tag" system (with *each employee personally signing* on and signing off the job to ensure continual employee accountability and control) . . . is an acceptable approach to compliance with the group lockout/tagout and shift transfer provisions of the standard.

OSHA Directive STD 1-7.3, at C-6 to C-7 (emphasis added). Appendix C also provides "examples to illustrate . . . several alternatives for having authorized employees affix personal lockout/tagout devices in a group lockout/tagout setting." *Id.* at C-2 to C-3. The examples include "a lockbox procedure" in which the energy isolating device is placed in a lockbox to which "[*e*]*ach* authorized employee assigned to the job then affixes his/her *personal* lock or tag," *id.* at C-5 (emphasis added), and a "Master Tag" system in which a master tag "is subsequently signed *by all* of the maintenance/servicing workers," *id.* at C-9 (emphasis added).

Notwithstanding this apparent consistency with the 2003 Directive, EEI takes comfort from Appendix C's further statement that "[t]his discussion is intended only as an example and is not anticipated to reflect operations at any specific facility." *Id.* at C-7 to C-8. Similarly, a footnote to Appendix B of the 1997 Directive states: "These [Appendix C illustrations] are intended as examples only. Other means of meeting the standard may also be used." 1997 Directive at 32 n.5. In EEI's view, these caveats demonstrate OSHA's intention -- at least in 1997 -- to permit lockout/tagout procedures different from those discussed in Appendix C, and particularly to permit procedures that do not require individual crew members to personally place or sign a device.

But describing as "examples" procedures that comply with the literal terms of the 1994 Standard -- which requires "personal lockout or tagout device[s] . . . or comparable mechanism[s]," 29 C.F.R. § 1910.269(d)(8)(ii)(D) -- hardly means that employers are free to use different procedures that do not comply with those terms. Under the established interpretive canon of *ejusdem generis*, "[w]here general words follow specific words," the general words are "construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Washington State Dep't of Social & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003) (alteration in original) (citation omitted). The "other means" sanctioned by the 1990 and 1997 Directives include procedures similar to the examples offered in those directives, but do not include procedures that are fundamentally different.

EEI endeavors to buttress its reliance on the 1997 Directive by adverting to the "negotiation history" that preceded it. According to the petitioner, "OSHA initially proposed to include" language in the directive that would require "personally signing on and off a tag, or physically applying a lock," but

subsequently "agreed to exclude it" in the face of opposition from EEI during the settlement negotiations following EEI's withdrawal of its petition for review of the 1994 Standard. Pet'r Br. at 5. OSHA, however, recalls the history differently. According to a 2003 letter from OSHA to EEI, no "agreement was ever executed, EEI eventually withdrew its challenge [to the 1994 Standard] unilaterally, [and] OSHA made no commitments in resolving that case." Letter from John L. Henshaw, OSHA, to Carl D. Behnke, EEI, at 2 (June 13, 2003). Unfortunately, we have no way to determine which entity is the better historian. And regardless of whether negotiation history is ever useful in explaining the meaning of a regulation that is clear on its face, irresolvably disputed history can be of no help at all.

Finally, EEI claims that the heart of the controversy between it and OSHA is a "fundamental error" that OSHA made when it crafted the Power Generation Standard in 1994. Pet'r Br. at 11. As the preamble to the standard reflects, OSHA thought the system operator exception ratified "lockout and tagout practices that are common in the electric utility industry," particularly the "use of a system operator who initiates and controls switching and tagging procedures." 59 Fed. Reg. at 4364. In EEI's estimation, however, "[w]hile intending to craft a provision that endorsed longstanding utility power plant practices," OSHA instead "inexplicably conditioned the application of" the system operator exception "upon the presence of power plant configurations and practices that simply do not exist" -- i.e., configurations in which the system operator is the only employee with physical access to the equipment. Pet'r Br. at 11. EEI insists that it was this 1994 "misperception" about how "power plants are configured" that led to "errors and omissions" that greatly limited the scope of the exception. *Id.* at 12. As counsel for EEI put it at oral argument, EEI's contention is essentially that "[t]here is a mistake in the preamble." 11/9/04 Oral Arg. Tape at 11:45.

What this argument makes manifest is that EEI's true quarrel is not with the 2003 Directive, but with the 1994 Standard and its preamble. Cast in this light, EEI's problem is clear: it should have made these points in a challenge to the 1994 Standard -- a challenge that it began but later withdrew -- not in a petition to review a compliance directive issued nearly a decade later. If OSHA was mistaken about the configuration of electric power plants, it made that mistake in 1994, not in 2003. And even if OSHA's policy is based on a faulty empirical premise (a point OSHA vigorously disputes), there is no doubt that the policy the agency set forth in the 2003 Directive is the same one it has consistently followed since 1994 -- in the original Standard, in the 1997 Directive, and in the 1999-2000 correspondence with EEI.

In short, the 2003 Directive is not a new standard, but rather "merely restate[s] in an abstract setting -- for the umpteenth time -- [OSHA's] longstanding interpretation" of its Power Generation Standard. *Independent Equip. Dealers*, 372 F.3d at 427. Indeed, OSHA foreswears drawing any independent authority at all from the directive, contending that in an enforcement action, any finding of a violation must be predicated on the standard itself, "just as if the [directive] had never been issued." *Pacific Gas & Elec. Co. v. FPC*, 506 F.2d 33, 38 (D.C. Cir. 1974). As EEI is therefore "no worse off than it would be had the [directive] not been issued at all," *Molycorp,* 197 F.3d at 547, it may not obtain review of the directive in the court of appeals.

IV

Because OSHA's 2003 Directive does not render any significant change to the agency's 1994 Power Generation Standard, the directive is not itself a new occupational safety or health standard within the meaning of 29 U.S.C. § 655(b).

Accordingly, we have no jurisdiction to review it.  *Workplace Health*, 56 F.3d at 1468-69.[4]  The petition for review is

*Dismissed.*

---

[4]In a footnote to its brief, EEI suggests that, if this court concludes it lacks jurisdiction to review EEI's petition directly, the case should be transferred to the district court.  Pet'r Br. at 35 n.19; *see Workplace Health*, 56 F.3d at 1469 (citing 28 U.S.C. § 1631).  We deny this request because the question of the district court's jurisdiction raises a host of issues, *see Sturm, Ruger*, 300 F.3d at 871-77, that have been neither fully briefed nor argued.  As a consequence, we cannot conclude that a transfer to the district court would be "in the interest of justice," as 28 U.S.C. § 1631 requires.