# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

STEEL ERECTORS ASSOCIATION OF
AMERICA, INCORPORATED,

*Petitioner,*

v.

OCCUPATIONAL SAFETY & HEALTH
ADMINISTRATION; UNITED STATES
DEPARTMENT OF LABOR,

*Respondents.*

No. 09-2319

On Petition for Review of an Order of the
Occupational Safety & Health Administration.
(CPL 02-01-046; CPL 02-01-048)

Argued: December 9, 2010

Decided: February 17, 2011

Before TRAXLER, Chief Judge, and WILKINSON and
MOTZ, Circuit Judges.

Dismissed by published opinion. Judge Wilkinson wrote the
opinion, in which Chief Judge Traxler and Judge Motz joined.

## COUNSEL

**ARGUED:** Kelly Culp Hoelzer, KOLLMAN & SAUCIER,
PA, Timonium, Maryland, for Petitioner. Heather R. Phillips,

UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondents. **ON BRIEF:** Frank L. Kollman, KOLLMAN & SAUCIER, PA, Timonium, Maryland, for Petitioner. M. Patricia Smith, Solicitor of Labor, Joseph M. Woodward, Associate Solicitor for Occupational Safety and Health, Julia Smith-Aman, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondents.

---

**OPINION**

WILKINSON, Circuit Judge:

In 2001, the Occupational Safety and Health Administration ("OSHA") issued new safety standards applying to the construction, alteration, and repair of steel buildings, bridges, and other structures. *See* 29 C.F.R. §§ 1926.750-.761. Shortly thereafter, OSHA issued a directive stating that violations of certain standards would be considered de minimis — and would therefore carry no penalty — if employers took different precautionary measures. *See* OSHA Directive CPL 2-1.34 (Mar. 22, 2002) ("2002 Directive"); *see also* 29 C.F.R. §§ 1926.754(b)(3) & (c)(1).

In April 2010, OSHA repealed that blanket rule, announcing that it would instead use its statutory authority to determine on a case-by-case basis whether violations of those standards were de minimis. *See* OSHA Directive CPL 02-01-048 (Apr. 30, 2010) ("2010 Directive"); *see also* 29 U.S.C. § 658(a). The Steel Erectors Association of America ("SEAA"), a trade association, challenges the 2010 Directive, arguing that it is an invalid "occupational safety and health standard" under 29 U.S.C. § 652(8) because it was promulgated without notice and comment and was unsupported by substantial record evidence.

We cannot address the merits of SEAA's challenge because we lack subject matter jurisdiction over this case. 29 U.S.C.

§ 655(f) — the jurisdictional provision allegedly authorizing SEAA's claim — only provides for judicial review of challenges to a "standard." So our ability to hear this case turns on whether the 2010 Directive is actually a standard or is instead some other form of agency action. Because we conclude that the 2010 Directive is more accurately viewed as a description of the agency's new enforcement policy, SEAA's challenge must be dismissed.

I.

A.

The 2010 Directive is the product of a complex statutory scheme as well as a lengthy rulemaking process, and it is necessary to set out both in some detail in order to properly understand this case. In 1970, Congress enacted the Occupational Safety and Health Act ("OSH Act") to "assure so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651(b). To that end, the OSH Act authorizes the Secretary of Labor to promulgate and enforce mandatory occupational safety and health standards. *See* 29 U.S.C. § 655. Under the Act, an "occupational safety and health standard" is defined as "a standard which requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment." 29 U.S.C. § 652(8). The Secretary also has the authority to "prescribe such rules and regulations as he may deem necessary to carry out [his] responsibilities." 29 U.S.C. § 657(g)(2).

In the immediate aftermath of the passage of the OSH Act, the Secretary of Labor used his authority under 29 U.S.C. § 655 to adopt the construction safety standards passed under the Construction Safety Act — a more targeted predecessor to the OSH Act. *See* 36 Fed. Reg. 10,466, 10,466 (May 29, 1971); *see also* 63 Fed. Reg. 43,452, 43,452 (Aug. 13, 1998).

Those standards, eventually codified in Subpart R of 29 C.F.R. § 1926, were designed to ensure the safety of construction workers at federal or federally assisted construction projects. *See* 63 Fed. Reg. at 43,452. Among other things, the standards required employers engaging in the construction or repair of multifloor steel buildings to build "tight and substantial" temporary floors within two stories or 25 feet below any floor "on which bolting, riveting, welding, or painting is being done." 29 C.F.R. § 1926.750(b)(2) (1972); *see* 39 Fed. Reg. 24,360, 24,360 (July 2, 1974). To the extent that constructing such floors proved impractical, employers could install "safety nets" at similar intervals. 29 C.F.R. § 1926.750(b)(1)(ii) (1972); *see* 39 Fed. Reg. at 24,360. Either way, the upshot of the standards was to force employers to take measures to protect their workers from injurious and potentially deadly falls.

OSHA slightly amended these standards in 1974, changing the distance requirement for temporary flooring from 25 feet to 30 feet, *see* 39 Fed. Reg. at 24,361, but nevertheless continued to receive requests for clarification of the fall protection provisions. *See* 63 Fed. Reg. at 43,452. Accordingly, in 1988, OSHA announced that it would devise a new set of steel erection safety standards. *See* 53 Fed. Reg. 2048 (Jan. 26, 1988). Four years later, OSHA formed the Steel Erection Negotiated Rulemaking Advisory Committee ("SENRAC") — a committee comprised of representatives from industry, labor, and government — to develop those standards. *See* 59 Fed. Reg. 24,389 (May 11, 1994).

The committee worked for eighteen months and met eleven times. In July 1997, SENRAC reached consensus around a set of standards, signed a binding consensus agreement, and then submitted its proposed regulatory text to OSHA. The next year, OSHA issued a Notice of Proposed Rulemaking, intending to codify SENRAC's text as the new Subpart R of 29 C.F.R. § 1926. *See* 63 Fed. Reg. at 43,452. As pertinent here, the proposed standards preserved the requirement of flooring

every two stories or thirty feet below ongoing steel erection work, but permitted employers to substitute safety nets without any showing that flooring was impracticable. *See* 63 Fed. Reg. at 43,466. The proposed standards also contained a new provision prohibiting the installation of shear connectors — which are steel bars and studs fastened to steel beams that allow concrete to be poured between the beams — until after the employer constructed a separate walking and working surface. *See* 63 Fed. Reg. at 43,466-67. This measure was designed to minimize the risk of workers tripping on the shear connectors.

Between August 13, 1998 and November 12, 1998, OSHA solicited public comments on the standards. Afterwards, OSHA held an informal public hearing on the proposed scheme. While OSHA received over 300 responses (in the form of comments, testimony, and documentary evidence), the temporary flooring requirement did not generate any controversy — indeed, it generated no comments at all. *See* 66 Fed. Reg. 5196, 5197, 5213 (Jan. 18, 2001) (summarizing history of the safety standards at issue). The shear connector rule, by contrast, had its opponents; they argued that requiring workers to attach shear connectors in the field would increase the risk of back injuries and falls as well as the costs of construction. *Id.* at 5213. Despite these objections, OSHA concluded that the use of preinstalled shear connectors would pose a "significant safety hazard" and decided not to make any substantive changes to the proposed rule. *Id.* at 5213-14. Thus, with respect to these two provisions, OSHA's final proposal reflected SENRAC's consensus.

The final step in the approval process was a public meeting with SENRAC to "obtain comments and feedback . . . on OSHA's proposed revisions" to SENRAC's work. *Id.* at 5197. The meeting was not a renegotiation, as SENRAC's members had already bound themselves to a written consensus agreement back in July 1997. At the meeting, none of the SENRAC members discussed abandoning the floor construction or shear

connector requirements; everyone agreed that those standards should be adopted as applied. However, shortly after the meeting, C. Rockwell Turner — a member of SENRAC who is also a member of SEAA — wrote a letter to OSHA requesting clarification of whether the use of personal fall protection systems (harnesses designed to prevent workers from suffering deadly falls) would be an adequate substitute for the flooring requirements. OSHA replied with a letter indicating that it would consider the failure to set up floors or nets to be a de minimis violation under 29 U.S.C. § 658(a) so long as the employer installed personal fall protection systems as a substitute. But OSHA did not indicate that the underlying standard requiring such floors and nets had changed in any way. Moreover, Turner's letter did not address the shear connector standard at all.

In January 2001, OSHA promulgated the current version of the safety standards (the "2001 Standards"). *See* 66 Fed. Reg. at 5196. The standards codified the flooring and netting requirements at 29 C.F.R. § 1926.754(b)(3) and codified the shear connector policy at 29 C.F.R. § 1926.754(c)(1). But the standards themselves did not contain any provision declaring that an employer could install fall protection systems as a substitute for either requirement, or that the use of such systems would render a violation of the standards de minimis.

### B.

One year after promulgating the final standards, OSHA issued Directive CPL 2-1.34 (Mar. 22, 2002) ("2002 Directive"). As relevant here, the 2002 Directive contained a series of "questions and answers" designed to clarify the recently adopted standards. Question and Answer 23 stated that "[w]here an employer establishes, communicates and enforces a requirement to be protected by fall arrest equipment at all times above 15 feet (or less), the failure to comply with § 1926.754(b)(3) is considered a *de minimis* violation and will not be cited." In other words, the 2002 Directive established

that violations of the temporary flooring requirements would not be met with penalties if the employer installed fall arrest equipment such as harnesses to protect workers. In the same vein, Question and Answer 25 set forth a similar enforcement policy with respect to the shear connector prohibition, stating that "[i]f an employer requires that all workers, including those engaged in connecting and in decking . . . be protected from falls by conventional fall protection, then the failure to meet the requirements of § 1926.754(c)(1) would be considered *de minimis* and no citation would be issued."

In 2010, however, OSHA issued Directive CPL 02-01-048 (Apr. 30, 2010) ("2010 Directive"). According to OSHA, the 2010 Directive sought to "clarify OSHA's enforcement policy" with respect to the flooring and netting requirements, *see* 29 C.F.R. § 1926.754(b)(3), and the shear connector prohibition, *see* 29 C.F.R. § 1926.754(c)(1). Noting that the provisions were both designed to prevent or at least minimize injuries from falls, and that "[f]alls continue to be the leading cause of fatalities among construction workers, including workers engaged in steel erection," OSHA concluded that "it is ordinarily inappropriate to consider the violation of these provisions to be de minimis on the basis that personal protective systems are in use." Accordingly, OSHA revised and rescinded Questions and Answers 23 and 25 in the 2002 Directive. In their place, OSHA reaffirmed that "compliance staff retain their normal discretion to determine, on a case by case basis, that violations are de minimis where there is no direct or immediate relationship to safety or health, and the employer's use of personal fall protection systems at all times may be a factor in such a determination."

That provision is what gives rise to this litigation. SEAA challenges the 2010 Directive, arguing that it is a "standard" subject to immediate judicial review under 29 U.S.C. § 655(f).* On SEAA's theory, the 2010 Directive is a stan-

---

*SEAA's original petition for review actually challenged OSHA Directive CPL 02-01-046 (Sept. 30, 2009) ("2009 Directive"), which was, for

dard either because it directly modifies 29 C.F.R. §§ 1926.754(b)(3) & (c)(1) or because it rescinds the 2002 Directive, which was itself a standard. According to SEAA, this means that the 2010 Directive must be vacated because it did not comply with the notice-and-comment requirement of 29 U.S.C. § 655(b) and because it is not justified by substantial record evidence. OSHA, by contrast, argues that we lack jurisdiction over this challenge because the 2010 Directive is not a standard. In OSHA's view, the Directive is instead a general statement of enforcement policy and thus constitutes a "regulation[ ]" under 29 U.S.C. § 657(g)(2).

## II.

In order to consider SEAA's arguments, we must examine the difference between a standard, *see* 29 U.S.C. § 652(8), and a "rule[ ]" or "regulation[ ]" under the OSH Act, 29 U.S.C. § 657(g)(2). After all, our jurisdiction turns on precisely that distinction. That is because standards are subject to immediate judicial review in the courts of appeals on petition of "[a]ny person who may be adversely affected by" them. 29 U.S.C. § 655(f); *see Workplace Health & Safety Council v. Reich*, 56 F.3d 1465, 1467 (D.C. Cir. 1995); *La. Chem. Ass'n v. Bingham*, 657 F.2d 777, 785 (5th Cir. Unit A Sept. 1981). By contrast, rules and regulations under 29 U.S.C. § 657(g)(2) are not subject to immediate appellate review. *See Reich*, 56 F.3d at 1467; *Bingham*, 657 F.2d at 784-85 (same), *see also Ne. Erectors Ass'n of the BTEA v. Sec'y of Labor*, 62 F.3d 37, 39 (1st Cir. 1995) (challenges to OSHA enforcement actions must be raised in the first instance in administrative proceedings, not in the federal courts).

the most part, similar to the 2010 Directive. However, on April 30, 2010, OSHA cancelled the 2009 Directive and replaced it with the 2010 Directive. The parties subsequently agreed to treat SEAA's petition as challenging the 2010 Directive.

The OSH Act, however, provides only modest clarification of the distinction between "standards" and "rules and regulations." While the Act declares that standards "require[ ] conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment," 29 U.S.C. § 652(8), it says comparably little about what constitutes a "rule[ ] or regulation[ ]," 29 U.S.C. § 657(g)(2). Indeed, with respect to the latter category, the Act merely states that the Secretary "shall . . . prescribe such rules and regulations as he may deem necessary to carry out [his] responsibilities under [the Act], including rules and regulations dealing with the inspection of an employer's establishment." *Id.* Likewise, while the Act sets forth procedures for both the promulgation of standards, *see* 29 U.S.C. § 655(b) (imposing, among other things, a notice and comment requirement), and judicial review of them once enacted, *see* 29 U.S.C. § 655(f) (standards must be "supported by substantial evidence in the record considered as a whole"), it says very little about how rules and regulations are created or reviewed.

Other courts have helped to illuminate the differences between the two categories. The Fifth Circuit's opinion in *Louisiana Chemical Ass'n v. Bingham* sets forth the generally accepted "basic function" test for determining if an agency pronouncement is a standard or is instead a rule or regulation. *Bingham*, 657 F.2d at 781. If the basic function of the pronouncement is to "address[ ] . . . a specific and already identified hazard," rather than to serve as a "purely administrative effort designed to uncover violations of the act and discover unknown dangers," it is a standard. *Id.* at 782; *see also Chamber of Commerce of the U.S. v. U.S. Dep't of Labor*, 174 F.3d 206, 209 (D.C. Cir. 1999); *Reich*, 56 F.3d at 1468.

For example, in *Chamber of Commerce*, the D.C. Circuit concluded that an OSHA Directive requiring workplaces to choose between acceding to "comprehensive inspection[s]"

and participating in a "Cooperative Compliance Program" imposing numerous safety requirements over and above existing statutory and regulatory requirements was a standard. 174 F.3d at 208-09. As the court reasoned, the directive "effectively obligate[d] employers, under penalty of certain inspection," to adopt a comprehensive safety and health program and thus "impose[d] on employers new safety standards more demanding than those required by the Act or by any pre-existing regulation implementing the Act." *Id.* at 211.

By contrast, if the agency action "is merely an enforcement or detection procedure designed to further the goals of the Act generally," it is a rule or "regulation." *Bingham*, 657 F.2d at 782; *see Chamber of Commerce*, 174 F.3d at 209; *Reich*, 56 F.3d at 1468. Thus, a "Records Access rule" requiring employers to make existing chemical exposure records available to employees, employee representatives, and OSHA authorities constitutes a rule or regulation under 29 U.S.C. § 657(g)(2), *see Bingham*, 657 F.2d at 778-79, 782-84, as does a requirement that employers report to OSHA information regarding accidents causing the death or hospitalization of three or more employees, *see Reich*, 56 F.3d at 1466.

More recently, the D.C. Circuit has further clarified that in order for an agency directive to be a standard, it must be "new." *Edison Elec. Inst. v. OSHA*, 411 F.3d 272, 277 (D.C. Cir. 2005) ("*EEI*"). Put differently, an agency directive merely reiterating the requirements of an existing standard for enforcement purposes constitutes a rule or regulation. *See id.* at 282. In *EEI*, the court confronted a directive rejecting EEI's proposed construction of the underlying standard at issue and affirming OSHA's prior interpretation of how the standard should be enforced. *Id.* at 274-76. The court concluded that the directive was a rule or regulation because it "is not a new standard, but rather 'merely restate[s] in an abstract setting—for the umteenth time-[OSHA's] longstanding interpretation' of" the underlying standard. *Id.* at 282 (quoting *Indep.*

*Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004)).

This approach makes good sense. As the *EEI* court pointed out, "it would be a stretch to say that a rule that merely restates an existing standard '*requires* conditions, or the adoption or use of one or more practices,'" insofar as "it is the existing standard, not the reiteration, that compels employer practices." *Id.* at 277 (quoting 29 U.S.C. § 652(8)). After all, such a rule would not "promulgate[ ]" a standard, 29 U.S.C. § 655(f), but would instead merely restate it, meaning it should fall outside the jurisdictional scope of 29 U.S.C. § 655(f). What is more, labeling as a standard a rule that merely restates an existing standard would allow parties to circumvent 29 U.S.C. § 655(f)'s 60-day review period limitation by giving them a second bite at the apple. *See EEI*, 411 F.3d at 277.

*EEI*, *Chamber of Commerce*, *Reich*, and *Bingham* are thus helpful in explaining the difference between standards and regulations. But they also help shed light on a broader principle: *why* the line between the two categories is a jurisdictional one. As the above examples show, the difference is roughly between substance and procedure. For the most part, standards impose substantive legal obligations on all regulated entities that often give rise to hefty compliance costs. Rules and regulations, by contrast, tend to cover such matters as enforcement and inspection — matters that do not change employers' actual legal obligations so much as the enforcement of them.

Thus, while it may be true that standards, in the mine run, are more likely to engender substantial expense, the test for determining whether a directive constitutes a standard or a rule is not based ultimately on cost. Rather, the statutory definition of standards as "requir[ing] conditions, or the adoption or use of one or more practices, means, methods, operations, or processes," 29 U.S.C. § 652(8), simply posits a distinction

between new legal obligations and enforcement of obligations that have long been in place.

Viewed in this light, it makes sense to allow immediate appellate review of standards but not of rules or regulations. Direct appellate review may provide more clarity more quickly, which is a boon in the context of challenges to new, industry-wide requirements demanding prompt compliance. By contrast, the normal method for challenging OSHA enforcement policies is to raise any such claims in administrative proceedings after a citation has been issued. *See Ne. Erectors*, 62 F.3d at 38-39 (jurisdiction over challenge to change in OSHA enforcement policy lies in the first instance in the agency's "extensive administrative process").

With these principles in mind, we turn to assessing whether the 2010 Directive is a standard or is instead a rule or regulation.

III.

Some aspects of this case are undisputed. Both parties agree that the 2001 Standards are "standards" within the meaning of 29 U.S.C. § 652(8). By their very terms, the requirement to build temporary floors or nets at ongoing steel erection sites, *see* 29 C.F.R. § 1926.754(b)(3), and the requirement to build separate working areas before installing shear connectors, *see* 29 C.F.R. § 1926.754(c)(1), "require[ ] conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment," 29 U.S.C. § 652(8). Moreover, both parties acknowledge that under the OSH Act, the Secretary has discretion to "prescribe procedures for the issuance of a notice in lieu of a citation with respect to de minimis violations" of these standards. *See* 29 U.S.C. § 658(a).

SEAA argues that the 2010 Directive is also a standard because it modifies these baseline requirements. The chief

difficulty with SEAA's argument, however, is that the 2010 Directive does no such thing. To the contrary: the Directive merely reaffirms the standards already on the books. By its very terms, the 2010 Directive declares that the failure to construct temporary flooring and netting below ongoing work sites constitutes a violation of the Act — which is exactly what the 2001 Standards say. *See* 29 C.F.R. § 1926.754(b)(3). The 2010 Directive further establishes that employers cannot install shear connectors before constructing an alternative work space — which is likewise just what the 2001 Standards require. *See* 29 C.F.R. § 1926.754(c)(1). Finally, the 2010 Directive states that compliance staff will "retain their normal discretion to determine, on a case by case basis, that violations are de minimis" — which is precisely the type of discretion 29 U.S.C. § 658(a) affords. In other words, far from imposing new "conditions," "practices, means, methods, operations, or processes," 29 U.S.C. § 652(8), the 2010 Directive reiterates the scheme adopted by the Secretary in 2001. While SEAA calls the 2010 Directive a new standard, it "is in fact a near-verbatim recitation of" the already-existing regulatory regime, confirming that it is actually a rule or regulation under 29 U.S.C. § 657(g)(2). *EEI*, 411 F.3d at 279.

To be sure, this case is different from *EEI* in one way: unlike in *EEI*, OSHA's stated enforcement policies actually have changed between the time the 2001 Standards were announced and the time the 2010 Directive was issued. Between 2002 and 2009, OSHA adopted a blanket policy of treating violations of 29 C.F.R. §§ 1926.754(b)(3) & (c)(1) as de minimis when employers installed personal fall arrest systems; today, by contrast, OSHA has reclaimed its traditional discretion over whether or not to impose sanctions in such circumstances. But this sole ground of distinction is not enough to turn the 2010 Directive into a standard.

*National Ass'n of Manufacturers v. OSHA*, 485 F.3d 1201 (D.C. Cir. 2007), helps explain why. In that case, the D.C. Circuit confronted a standard imposing disclosure obligations

on the chemical industry "based on the 'latest edition' of a list of dangerous chemicals." *Nat'l Ass'n of Mfrs.*, 485 F.3d at 1202. Industry groups argued that an amendment to the underlying list of chemicals "effectively amended the *standard* without notice and comment," permitting them to challenge the revisions under 29 U.S.C. § 655(f). *Id.* (emphasis added). But the court dismissed their petition as untimely because the change to the list "did not modify" the standard itself, which had "*remained unchanged* in relevant aspects for approximately twenty years." *Id.* at 1205 (emphasis added). This case is analogous: while OSHA's enforcement policy has changed, the underlying standards have not been altered at all.

At its core, this case boils down to a simple reality: a person who opened Volume 29 of the Code of Federal Regulations in 2001 would find the exact same requirements in 29 C.F.R. §§ 1926.754(b)(3) & (c)(1) that are on the books today. The fact that the 2010 Directive indicates that OSHA will enforce those standards differently than before bespeaks little more than an exercise of enforcement discretion, and certainly does not reflect the imposition of any new "practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment," 29 U.S.C. § 652(8). At bottom, SEAA's quarrel is not really with the 2010 Directive, but with the 2001 Standards themselves. But the time for such court challenges has long passed. *See* 29 U.S.C. § 655(f).

## IV.

SEAA, however, advances a welter of arguments for why the 2010 Directive is indeed a standard. We shall address them in turn.

## A.

First, SEAA argues that the 2010 Directive is a standard because it "purports to correct a particular 'significant risk'"

and is "aim[ed] toward correction rather than mere inquiry into possible hazards." *Bingham*, 657 F.2d at 782. As SEAA points out, "[u]nquestionably, the rescission of the [blanket] *de minimis* rule is designed to ameliorate what the Agency has determined [is a] significant risk of falls in the steel erection process." Br. of Appellants at 21.

It is true that the 2010 Directive seeks to decrease the risk of falls at worksites. But SEAA's conclusion — that the Directive is a standard — does not follow from this premise. That is because the 2010 Directive is functionally identical to the 2001 Standards themselves. Both were motivated by the same purpose: minimizing the number of injurious and potentially fatal falls at worksites. Both adopt the same means: imposing sanctions if appropriate upon employers who neglect to construct temporary floors or nets under ongoing steel erection work or to construct separate walking and working surfaces before installing shear connectors. And both seek to bring about the same outcome: reducing the number of injuries and falls by encouraging employers to take protective steps.

In other words, there is nothing new about the ways in which the 2010 Directive addresses a "significant risk"; it uses the exact same means as the 2001 Standards. Viewed in that light, it makes little sense to view the 2010 Directive as a new standard subject to judicial review. *See Nat'l Ass'n of Mfrs.*, 485 F.3d at 1205. If we were to adopt such an approach, every agency statement restating — let alone clarifying — existing standards would constitute a new standard subject to immediate challenge. At best, this would lead to duplicative litigation over the merits of enforcement approaches OSHA decided upon years or even decades ago. At worst, it could cause OSHA to decline to clarify its standards in order to insulate them from repetitive judicial review. SEAA's view, in short, could deprive the system of even modest flexibility and deny it the ability to adapt enforcement proceedings to the lessons of experience. This approach is

untenable. It is plainly "silly to permit parties to challenge an established regulatory interpretation each time it is repeated. Such a regime would quickly muzzle any informal communications between agencies and their regulated communities - communications that are vital to the smooth operation of both government and business." *Indep. Equip. Dealers*, 372 F.3d at 428.

B.

Next, SEAA argues that the 2010 Directive is a standard because it modifies the 2001 Standards themselves. SEAA's argument proceeds as follows: while the text of the 2001 Standards did not incorporate or even mention a de minimis policy for employers who install personal fall arrest systems, a member of SENRAC (Turner) sent a letter to OSHA asking if such violations would be treated as de minimis. In response, OSHA confirmed that enforcement policy, effectively incorporating it into the standards themselves. Thus, argues SEAA, the rescission of that policy must be a standard as well.

To recite this argument is almost enough to refute it. SENRAC negotiated for several months before coming up with the final standards, and its members agreed to bind themselves to the outcome of those negotiations. In such circumstances, an ex parte communication between one member of SENRAC and OSHA simply cannot trump the text of regulations passed after an opportunity for notice and comment. While SEAA argues that OSHA's response letter constitutes an alteration of the standards, the fact remains that such alterations cannot be found anywhere in the text of the ultimately enacted regulations. Indeed, nothing in the 2001 Standards states that violations of 29 C.F.R. §§ 1926.754(b)(3) & (c)(1) are automatically de minimis when an employer installs personal fall arrest systems. Moreover, if such a policy had been present or even implied in the 2001 Standards, there would have been no need for the 2002 Directive to announce that de minimis policy again. In short, accepting SEAA's argument

would require us to turn many of the foundational principles underlying modern administrative law on their head.

## C.

SEAA's next argument is that the 2010 Directive is a standard because companies will have to expend money and effort in order to come into compliance. SEAA rejects OSHA's argument that the Directive "is nothing more than the Secretary's announcement of how she intends to exercise her discretion in viewing violations of §§ 1926.754(b)(3) & (c)." Reply Br. of Appellants at 10. Instead, SEAA contends that the 2010 Directive has "real-world impact, requiring employers to immediately assemble decking/planking or netting, regardless of any personal fall protection systems used." *Id.* at 12. Further, SEAA argues that the fact that inspectors might declare violations de minimis is irrelevant, insofar as no employer will want to risk being declared noncompliant.

It is undoubtedly true that the new enforcement regime will impose some costs on employers. But that provides no basis for concluding that the 2010 Directive is a standard. Complaints like SEAA's are commonplace whenever an agency decides to increase the frequency or level of scrutiny of its enforcement actions. To be sure, these complaints are often understandable; stepped up enforcement efforts often do engender costly behavioral changes. But those costs do not alone convert an enforcement policy into a standard. Such costs have always been legally required by 29 C.F.R. §§ 1926.754(b)(3) & (c)(1). Though OSHA decided not to force their imposition between 2002 and 2009, it did so purely as a matter of its enforcement discretion. And while the new enforcement policy may be onerous, the fact remains that Congress has only provided for standards to be immediately appealable in this court. *See* 29 U.S.C. § 655(f). If Congress struck that balance wrong, it is for Congress to correct it. And if the regulatory regime for fall protection in multi-story construction projects is too burdensome, there is nothing to pre-

vent SEAA from persuading the legislative and executive branches to change it.

### D.

SEAA makes one final argument. It suggests that the 2002 Directive, which announced the blanket de minimis policy for violations of the temporary flooring, temporary netting, and shear connector requirements, was itself a standard insofar as it "modified the Final Rule[s]" — that is, the 2001 Standards. Br. of Appellants at 4. As a result, SEAA contends, the 2010 Directive, which rescinds the 2002 Directive, must also be a standard. To the extent SEAA presses this argument, it is unavailing.

For starters, nothing about the 2002 Directive suggests that it was a standard. It imposed no new requirements or conditions. *See EEI*, 411 F.3d at 277. If anything, it softened the existing requirements in practice, allowing employers to utilize an arguably less expensive alternative to the mandates of 29 C.F.R. §§ 1926.754(b)(3) & (c)(1). What is more, the 2002 Directive did not go through notice and comment as required of a standard by 29 U.S.C. § 655(b); instead, it consisted of a series of questions and answers designed to illustrate how the statute operated.

Finally, and perhaps most importantly, the 2002 Directive, like the 2010 Directive, treated failure to comply with 29 C.F.R. §§ 1926.754(b)(3) & (c)(1) as a *violation* of the 2001 Standards — a result that would be anomalous if the 2002 Directive had altered the standards themselves. The 2002 Directive established that "the failure to comply with § 1926.754(b)(3) is considered a *de minimis* violation and will not be cited" and that "the failure to meet the requirements of § 1926.754(c)(1) would be considered *de minimis* and no citation would be issued" when an employer installed personal fall arrest systems. But the critical words here are "violation" and "failure to meet the requirements." These phrases make

clear that the 2002 Directive only changed OSHA's enforcement policy towards violations without actually changing the underlying standards themselves. The 2010 Directive thus did not become a standard merely by repealing the 2002 Directive, as the 2002 Directive was not a standard.

V.

At every point between 2001 and today, employers who wished to comply with the regulations on the books had to build temporary floors or nets under ongoing steel erection worksites and forbear from installing shear connectors until after they constructed separate working surfaces. At every point, employers who utilized fall protection systems as a substitute for the measures required by the regulations were technically out of compliance. And at every point, under the plain text of the standards, those employers could have been cited and fined for their conduct. That OSHA may have elected not to prosecute such violations for a number of years does not mean that violations did not occur. Therefore, because the 2010 Directive does little more than reiterate the requirements of the 2001 Standards and announce the agency's enforcement policy on a foregoing basis, it is not a "standard" under the OSH Act and it is not reviewable under 29 U.S.C. § 655(f).

This new enforcement policy may impose some hardship on SEAA's members, and if that is the case, those members have several options to remedy the difficulties they foresee. If an enforcement action is filed against them, they can contest that action before the Occupational Safety and Health Review Commission and, ultimately, before a court of appeals. *See* 29 U.S.C. §§ 659(c), 660; *Ne. Erectors*, 62 F.3d at 39. Alternatively, SEAA can try to persuade the Secretary to reinstate the 2002 Directive, or attempt to have Congress change the judicial review provisions of the OSH Act.

What SEAA cannot do, however, is obtain immediate review of the 2010 Directive in this court. To hear SEAA's

claim, we would have to ignore the clear limits Congress has placed on our jurisdiction. We decline to do so. SEAA's petition for review of the 2010 Directive is hereby dismissed.

*DISMISSED*